**Catherine M. Barber, Ph.D.**
Clinical & Forensic Psychology
25 S. Haddon Avenue, Unit 496
Haddonfield, New Jersey 08033

---

856.427.6766                                                      PA License No. PS006085L
                                                                  NJ License No. 3393

January 3, 2026

Mary Claire Wolf, Esq.
Assistant Federal Defender
Office of the Federal Defender, MDFL
400 North Tampa Street, Suite 2700
Tampa, Florida 33602

        Re:    United States v. Shimon Y. Soffer (a/k/a "Systoned")
                Indictment No. 8:25 - cr-00038-VMC-AEP

Dear Ms. Wolf:

      As requested, I have conducted a psychological evaluation of your client, Shimon Soffer, who is charged in the above-identified Indictment with one count of Mail Fraud Conspiracy that allegedly occurred from on or about 12/28/21 through 4/14/22. You requested this evaluation in part to assess whether Mr. Soffer may have lacked capacity, due to his mental health condition and any other related factors, to have made a knowing, intelligent, and voluntary waiver of his Miranda rights at the time he was questioned by Homeland Security investigators on 2/5/25; and overall to assess the reliability of the information he provided during that interview.

      To date I have evaluated Mr. Soffer for a total of three hours and 45 minutes (1.5 hours on 10/5/25, 1.5 hours on 10/31/25, 45 minutes on 11/13/25) by videoconference in accord with American Psychological Association standards for the use of Telehealth in conducting psychological evaluations. The evaluation consisted of biographical and clinical/diagnostic interviews, mental status examination, and a semi-structured interview to assess Mr. Soffer's comprehension of his Miranda rights at the time he cooperated with the Homeland Security interview on 2/5/25.

1

A separate report to follow will address in further detail Mr. Soffer's personal history and characteristics, his mental health history, and other issues potentially relevant to understanding his offense conduct. The purpose of that report will be to aid in your discussions with the Government regarding an appropriate plea agreement and to offer relevant information for the Court's consideration at the time of Mr. Soffer's eventual sentencing.

In the course of formulating the findings and opinions stated below I reviewed the following documents and records:

1. The Indictment filed on 2/5/25;
2. Audio recording of interview of Mr. Soffer conducted on 2/5/25 by Agent Lara of Homeland Security with accompanying printed transcript;
3. St. Joseph's University Medical Center psychiatric ED medical records (April 2019);
4. Summit Oaks Hospital inpatient psychiatric records (March-May 2019);
5. Skyland Trail inpatient psychiatric records (May-June 2019); and
6. Princeton House intensive outpatient psychiatric records (June-August 2019).

At the start of the first interview I explained the scope and purposes of the evaluation to Mr. Soffer and the associated absence of confidentiality. I informed him that one or more reports summarizing my findings would be provided to you for further disclosure to the Court and the Office of the United States Attorney. He indicated he fully understood these conditions and readily consented to proceed. I reminded him of these parameters at the beginning of the second and third interviews, and he affirmed his consent on both occasions. Mr. Soffer's demeanor throughout the interviews was consistently polite, open, and very cooperative, and there were no indications that he was giving inconsistent, misleading, or self-serving information.

<u>Interview summary - relevant background</u>

For the purpose of this report, which is limited to addressing issues relevant to the reliability of Mr. Soffer's statements during the 2/5/25 interview with Homeland Security and his capacity to have competently waived his <u>Miranda</u> rights, a brief summary of his personal background and mental health history follows. Mr. Soffer provided biographical information fully consistent with narratives contained in the multiple psychiatric records enumerated above, all of which substantially precede the time frame of the alleged offense conduct.

Mr. Soffer (hereafter "Shimmy") reported he was raised in a largely sheltered and insular Jewish Orthodox community in northern New Jersey. He attended an Orthodox Montessori preschool program for two years and participated in neighborhood play groups in his home town of Passaic, New Jersey, and attended the first and second grades at a Hillel school (Jewish day school). When Shimmy reached third grade the family moved to the nearby town of Clifton, where he attended another all-boys Orthodox school through the eighth grade. Beginning in the third grade Shimmy was prescribed Strattera, a medication used to treat Attention Deficit Hyperactivity Disorder, at the recommendation of multiple teachers and therapists with whom his parents consulted due to his "rowdy" behavior and difficulties paying attention in class. He stated that this medication made him feel "inwardly dead" and "like too much of a zombie to act out," so he struggled at times with compliance. Unfortunately, the Orthodox school did not have provisions for special education services and Shimmy was not formally evaluated for any other potential learning problems. Shimmy then attended a high school in Riverdale in the Bronx until midway through his twelfth grade year, where he continued to struggle with behavioral and attention issues. He was sent to a "school for wayward boys" in Connecticut for several weeks, but was suspended for misbehavior which made his parents "not exactly too happy." Shimmy eventually dropped out prior to completing the 12th grade, but he later obtained his GED "at the insistence of family." Throughout his school years, Shimmy described himself as a "loner" who "made friends easily, but not necessarily real friends or close friends." He related that he always "kept to myself [and] enjoyed books over the company of others."

Shimmy is the eldest of his parents' five children; he has three brothers and one sister. He noted that he grew up "around extended family" as his mother was one of eight siblings and his father was one of 11 or 12, all of whom married and had multiple children. Similar to the constraints of his education, Shimmy's social life while growing up was strictly limited to family and others members of the Orthodox community in his family's close geographic area. He talked at some length about feeling from a young age that he was very different from other kids in his community, in that he did not feel a genuine affinity toward the religious teachings and practices that saturated his day-to-day world. This sense of difference led him to "just be quiet," "keeping my true thoughts to myself."

Around the age of 18 after a painful breakup with his then-girlfriend, Shimmy began to develop depression accompanied by suicidal thoughts. On 3/29/19 shortly after his 19th birthday, Shimmy was admitted to Summit Oaks Psychiatric Hospital in Summit, NJ after first being taken to St. Joseph's Medical Center in Paterson, NJ for an emergency evaluation. Shimmy's mother had called the Crisis help line after an alleged

3

incident of aggression toward her, during which he threw a glass bottle of Gatorade at her car windshield, breaking it, following an argument. History gathered at that time indicated that Shimmy had been having significant problems with mood instability and behavior in recent years and had been previously hospitalized while living temporarily with his grandmother in Boston. He also disclosed a history of heavy marijuana use since approximately the age of 13 as well as recent abuse of the benzodiazepine Xanax. Shimmy was stabilized during this hospitalization and diagnosed with Bipolar Disorder, most recent episode manic, as well as Cannabis Use Disorder. At the time of his discharge on 4/5/19 he was given prescriptions for continued mood-stabilizing (Lithium) and antipsychotic (Haldol) medications with a plan to follow up with an outpatient psychiatrist and continue seeing his current psychotherapist.

Less than three weeks later on 4/24/19, Shimmy experienced intense suicidal ideation and called an ambulance which took him once more to St. Joseph's University Medical Center for emergency psychiatric evaluation. From there he was transferred the next day as an involuntary patient for a higher level of care back to Summit Oaks, where he remained from 4/25/19 through 5/7/19. During this 12-day admission at Summit Oaks Shimmy's diagnosis was revised to Schizoaffective Disorder, reflecting the presence of symptoms of a thought disorder on the schizophrenia spectrum along with his bipolar mood disturbance. In addition, Shimmy's diagnosis of moderate Cannabis Use Disorder was seen as contributing to the acuity of his symptoms. His medications were changed to a different antipsychotic that is also used for mood stabilization (Abilify) along with an additional mood stabilizer (Trileptal) and sedative (Trazodone). Following his stabilization at Summit Oaks, Shimmy was directly transferred on 5/8/19 to Skyland Trail, a dual diagnosis inpatient treatment program in Atlanta, Georgia, for further residential treatment. Shimmy remained in this program for over a month and progressively improved. His Abilify and Trileptal medications were continued, with the addiction of Remeron, an antidepressant.

Upon his discharge on 6/20/19, Shimmy was transferred to a partial hospitalization program back in New Jersey, at Princeton House in North Brunswick. He completed this program on 8/7/19 and was discharged to routine outpatient psychiatric care, with his diagnoses now revised again to Bipolar Disorder (type I; i.e., severe enough to have required hospitalization) and Cannabis Dependence, as well as a notation of Antisocial Personality Disorder in light of his history of acting-out behavior in youth combined with multiple prior arrests related to drug possession. Two weeks prior to his discharge from Princeton House, Shimmy stopped taking his prescribed medications and reported to staff that he did not intend to keep taking them, although he indicated openness to potentially re-starting medication as needed in the future.

4

Shimmy's symptoms of mood disturbance have now been under good control without medication, with maintenance psychotherapy only, for a sustained period of time. He stated that he has now been unmedicated for for close to five years, and that there have been "times I've been hypomanic...and possibly even at times encroaching psychosis-level, but by and large, I've been pretty stable." He attributed this to living away from his family for the past several years and having more personal freedom. Shimmy also continues to see a therapist, which he feels contributes to helping him maintain his emotional stability.

While it was clear throughout the interviews that Shimmy was reluctant to say anything overtly negative about his parents or family, or in general about the Orthodox community in which he was raised, he conveyed that he felt he had experienced a form of chronic trauma associated with growing up in an environment he had always felt "forced to continue to be in." As a result of "years and years of being very cooperative and tuned to that, the ability to put on a mask," Shimmy described himself as "always feeling under threat." He also talked at length about traumatizing experiences he had while in psychiatric hospital settings, including being repeatedly involuntarily medicated and once being punched and seriously injured by another patient. As a consequence of these experiences, he stated, "I'm always stuck in fight or flight."

Current mental status

Shimmy logged in promptly for all three evaluation meetings, exhibiting a consistently polite and cooperative demeanor. No unusual physical movements or restlessness were noted. He was alert and oriented to time, date, location, self, and circumstances. His attention and concentration were intact and sufficient to sustain his active participation in the interviews. He made good eye contact and rapport was easily established. His speech was articulate and within normal limits in rate, rhythm, volume, and tone. Shimmy expressed himself coherently and responded to all questions relevantly. He did not convey any suspicious, irrational or bizarre ideas, nor any perceptual disturbances. His thought processes were organized. Shimmy's working memory (ability to hold information in mind while formulating a response), auditory comprehension, and verbal expressive capacity were all fully intact. His intellectual functioning was estimated to fall within the high average to superior range based on the sophistication of his vocabulary and his demonstrated capacity for expressing abstract concepts.

Short-term memory functioning also appeared fully intact; however, Shimmy related that he has significant trouble with his long-term memory, particularly for biographical events. He related, "Some people say they can clearly remember their

childhood, but I don't have an active memory of most of my life. I can remember certain points, like I read it in a book." Disruption of episodic memory (i.e., memory for personal events), a form of declarative or long-term memory, is in fact commonly observed in the context of both exclusive-event and chronic or interpersonal forms of trauma. Memory for events may be heightened to the point of becoming distressing and intrusive (for example, as in the case of vivid flashbacks), or at the other extreme may have a fragmented, dissociative quality. The latter is more often seen in the context of chronic, interpersonal forms of trauma, as the development of critical brain circuits that are involved in both the regulation of emotions and in the consolidation of experiences from short-term recall into long-term memory tends to be disrupted when a young person lives in a chronic state of heightened emotional stress, hyper-arousal, and threat perception.[1]

Shimmy's affect (external expression of inner mood state) was consistently cordial and euthymic, and he demonstrated appropriate emotional responsiveness to the various topics discussed throughout the interview. He related that he has always felt a mild to moderate degree of anxiety, but this did not interfere with his ability to engage fully in the interviews. He did not report currently or recently suffering from clinically significant symptoms of depression or mania, and denied experiencing any recent suicidal ideation.

<u>Assessment of Miranda competency & reliability of statements</u>

Shimmy was questioned in connection with the instant charge of mail fraud conspiracy by Homeland Security agents on 2/5/25, upon his return to the U.S. following a trip to Israel with his family that he stated lasted a little more than a week. He stated that the trip itself was stressful as he was continually among his Orthodox family, "around people where I have to act different."

Almost immediately upon the agent's initiation of questioning at 5:35 a.m. on 2/5/25, Shimmy stated that he was "extremely overtired" in response to the agent's inquiry whether he had "any medical condition we should know about." The agent dismissed this comment with a response indicating that he was also tired himself, and did not ask any clarifying questions. During the present evaluation, I asked Shimmy why he made this statement at the outset of questioning, and he explained that he had

---

[1] Fenster, R., Lebois, L., Ressler, K., & Suh, J. (2018). <u>Brain circuit dysfunction in post-traumatic stress disorder: from mouse to man</u>. *Nature Review: Neuroscience* 19(9): 535-551.
See also:
Cross, D., Fani, N., Powers, A., & Bradley, B. (2017). <u>Neurobiological development in the context of childhood trauma</u>. *Clinical Psychology* 24(2): 111-124.

been continuously awake the entire preceding day as well as for the full duration of the flight back from Israel, a total of 26 to 28 hours. He explained, "For me personally, having issues with my mental health for quite some time, the number one way for me to avoid having to go down the road to being hospitalized, or forced to rely on medication, is to never go past 24 hours [of being continuously awake], and if I am [awake for an extended period], to avoid contact altogether [with other people] and stay in bed - just read, take a shower, *et cetera* - until I pass out." He stated that he and his family had woken up between 8:00 and 9:00 a.m. in Israel, had a full day of touring, said goodbye to family members and arrived at the airport between 6:00 and 7:00 p.m. to await their later departure. He recalled that the flight to the U.S. took approximately 12 hours, during which he did not sleep but read and watched videos in flight; and by the time he was questioned (at 5:30 a.m. local time, which would have been approximately 12:30 p.m. in Israel, a total elapsed time of approximately 27 hours), he stated he felt "like I was watching a movie screen viewing of what was going on. I barely remember the interrogation, the same way I barely remember some portions of my life - like I wasn't alive during that portion. I'd compare it to an outsider's perspective of split personality disorder. That's me every single time I'm without sleep to an excessive amount, or in that 'manic state' as you call it."

Shimmy's description of being in a detached and hypomanic mental state during questioning is consistent with what is known about the effects of sleep disruption on individuals diagnosed with Bipolar Disorder. It is well established that sleep deprivation - even as little as one full night without sleep - can destabilize mood and precipitate the onset of a manic episode, in which cognition and judgment become impaired.[2] Shimmy proceeded to openly answer all questions posed by the agents about his participation in the mail fraud conspiracy over the course of the questioning, which continued for nearly four hours, concluding at 9:27 a.m. When asked how long the questioning had continued, Shimmy estimated "An hour, or maybe an hour plus," a significant misperception of time that is also consistent with the dissociated state he described.

Asked to reflect on why he answered questions so readily, Shimmy stated, "When I was in that frame of mind, nothing would have surprised me. There was no conscious thinking about it in terms of the consequences; that's like saying, 'Do you

---

[2] Plante, D., & Winkelman, J. (2008). Sleep disturbance in bipolar disorder: therapeutic implications. *American Journal of Psychiatry* 165:7, July 2008.
See also:
Mondimore, F. (2020). Sleep deprivation is bad news for bipolar patients. *Psychology Today* (https://www.psychologytoday.com/us/blog/bipolar-101/202008/sleep-deprivation-is-bad-news-bipolar-patients)

think you're going to have any consequences of stealing food to feed yourself?' — You're doing it for survival." When asked in follow-up if he understood at the time of the interrogation that he had the option to not answer questions, and whether he felt he made the correct decision in cooperating, Shimmy stated, 'It's not a relevant question, because it's like asking, 'Do you think you made the right decision to force your mother to go into contractions on the day you were born?' It's like saying I made a decision to be born" - indicating that he viewed himself as having absolutely no agency in the situation of the interrogation. He added, "I'm sure with a normal view of the world, someone looking back would say 'big mistake,' but as someone with a nihilistic take of the world…I compare it to my time spent in a psych word and hypomanic state. The only thing different if that happened to me now would be that I would attempt to not get there in the first place, and not be sleep-deprived. I likely would have given them some nice expletives and said 'Get me a lawyer,' [but] having lived my entire life through discomfort, I can put on a mask much better than most people. Am I going to sit here and put up a fight? If my state of mind *had* been normal, it might have been deference to authority." These statements reflect Shimmy's reflex to respond with acquiescence and conformity when confronted by authority, which he acquired over the years of his youth in the setting of the strict, punitive Orthodox schools he attended.

While Shimmy has a history of significant mental illness that required several inpatient hospitalizations, and at one time was given a diagnosis indicating marked symptoms of a thought disorder on the schizophrenia spectrum (Schizoaffective Disorder) in addition to his bipolar mood disorder, at the time he responded to questioning by Homeland Security agents on 2/5/25 he had been in a stable period of symptom remission without the aid of psychoactive medication. Therefore, there is not an issue of active symptoms of mental illness impairing his comprehension of his rights under Miranda as they were explained to him before active questioning began. Further, there is no apparent general cognitive or intellectual impairment that would reasonably interfere with his ability to have made a *knowing* waiver of his Miranda rights - i.e., to have correctly understood the meaning of those rights as they were explained to him, and the implications of waiving them.

However, Shimmy was in a state of sleep deprivation in excess of 24 hours, the effects of which are well known as likely to trigger in individuals diagnosed with Bipolar Disorder the onset of a manic or hypomanic state accompanied by dissociative (or "out-of-body") impairment of perception and reality contact. In this state of mind, it would have been extremely difficult for Shimmy to have made an *intelligent* waiver of his Miranda rights, i.e., to rationally weigh what was in his best interest in the context of the proposed questioning, including the ability to decide at any point to stop answering questions and request legal counsel.

With regard to his capacity to render a *voluntary* waiver of his Miranda rights, this would also have been impaired by two salient, related factors: first, the same dissociative, sleep-deprived state that interfered with his capacity to intelligently weigh his options would logically have also interfered with his ability to freely choose whether to cooperate; second, his life-long conditioned behavior of submitting to the forces of authority - even if insincerely - rendered Shimmy significantly more likely than an average reasonable person to submit to the pressure to answer questions posed by authority figures, even in the absence of any attendant circumstances of overt coercion. This tendency to submit to the express or implied pressure of authority was shaped during his upbringing within a cloistered community governed by the strict dictates of Orthodoxy and the orders and pronouncements of rabbinical authority figures, and was later reinforced in the setting of involuntary psychiatric treatment, where Shimmy learned that to earn his freedom he needed to comply with the expectations of medical authority figures.

Even for a person unaffected by a history of mental illness, the influence of sleep deprivation, or a personal history of profound conditioning to submit to authority, the experience of being questioned by multiple federal law enforcement officials would be an overwhelming and anxiety-producing experience. For someone such as Shimmy, with the confluence of these factors converging to affect him at the time of questioning, his fundamental intelligence did not afford sufficient capacity to rationally appraise his situation and make decisions strictly in his own self-interest, beyond ensuring that he had a basic comprehension of his rights as they were enumerated and explained to him. Therefore, in consideration of these factors collectively, it is my opinion to a reasonable degree of psychological certainty that while Shimmy likely had the capacity at the time he was questioned to knowingly waive his Miranda rights, he was impaired in his capacity to have rendered either an intelligent or fully voluntary waiver of those rights.

Further, because of the issues with Shimmy's long-term memory as discussed above, there may be doubt about the *reliability* of information he provided in the course of questioning. It is important to note that this does not imply he may have deliberately given inaccurate or misleading information - the issue of his *veracity*, i.e., his intention to be truthful or not, is strictly an issue for the fact-finder and not a proper matter for expert opinion. The issue of reliability refers exclusively to the possibility of confused or misremembered information, especially in light of the issue of his sleep deprivation.

The foregoing findings and opinions are offered to a reasonable degree of psychological certainty based upon my integration of the clinical interview findings with review of the discovery documents and Mr. Soffer's recorded statement, all

9

considered in the context of my understanding of the legal standards applicable to the issues addressed and my experience evaluating similarly-situated defendants.

Respectfully submitted,

/es/ *Catherine M. Barber, Ph.D.*
Catherine M. Barber, Ph.D.